# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

KENNETH TWYMAN BLUEW #856253,

        Petitioner,

v.                              Case No. 16-11992

JEFFREY WOODS,

        Respondent.

_____/

## OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY

### I. INTRODUCTION

Michigan prisoner Kenneth Bluew ("Petitioner") filed this habeas corpus petition under 28 U.S.C. § 2254. Petitioner was convicted of first-degree premeditated murder, M.C.L. § 750.316(1)(a), assault of a pregnant individual with intent to cause miscarriage or stillbirth, M.C.L. § 750.90a, and two counts of possession of a firearm during the commission of a felony, M.C.L. § 750.227b. He raises five claims for habeas corpus relief. For the reasons explained below, these claims lack merit, and the court will deny the petition.

### II. BACKGROUND

Petitioner was a Buena Vista Township police officer at the time of the murder of Jennifer Webb on August 30, 2011. Webb was 8-1/2 months pregnant with Petitioner's child when she was murdered. It was the prosecution's theory that Petitioner choked Webb and staged the scene to make it appear that she hanged herself. The defense

argued that Webb committed suicide by hanging. Overwhelming evidence supported the prosecution's theory of the case.

Webb visited her friend Andrea King on the evening of August 30, 2011. King testified that Webb was very excited about her baby, and she told King that Petitioner was the father. Webb planned to put Petitioner's name on the baby's birth certificate and to seek assistance from the Friend of the Court. Webb left King's home at approximately 8:30 p.m., telling King that she was going to see "Baby Daddy." (ECF No. 4-11, PageID.799.)

Petitioner was on duty the night of Webb's murder. For approximately 30 minutes that evening—from 10:00 p.m. to 10:30 p.m.—Petitioner failed to respond to multiple attempts to contact him via his police radio, patrol car computer, and cell phone. Buena Vista police officer Tim Patterson testified that his shift commenced at 10:00 p.m. and that shortly thereafter, he heard central dispatch performing radio checks. (ECF No. 4-11, PageID.814–815.) Officer Patterson explained that if central dispatch has not heard from an officer during a given hour, central dispatch conducts a department radio check to confirm the officer's safety. (ECF No. 4-11, PageID.815.) Petitioner did not respond to the first hourly check. (ECF No. 4-11, PageID.815.) Petitioner then failed to respond to a 10:20 p.m. radio check from central dispatch. Officer Sara Sylvester also attempted to contact Petitioner by cell phone but was not successful. (ECF No. 4-11, PageID.815.) Additionally, central dispatch could not reach Petitioner on the Buena Vista administrative channel. After these failed attempts at contact, Officer Patterson sent Petitioner a text message via the patrol car's computer, which would have either flashed or sounded an alarm, and central dispatch sent another alert tone to Petitioner's patrol

car. (ECF No. 4-11, PageID.815–817.) After all of these attempts at contact, Officer Patterson finally heard Petitioner attempt to call Officer Sylvester on the administrative channel after 10:30 p.m. (ECF No. 4-11, PageID.818.) Petitioner then contacted dispatch and informed them, but he did not specify his location.

Officer Patterson drove around in the general area he knew Petitioner would be patrolling. As Officer Patterson drove near the Van Buren Waste Water Treatment Facility, he saw Petitioner's patrol car, with its spotlight shining on another vehicle, a Pontiac Aztec. (ECF No. 4-11, PageID.819.) Petitioner exited his vehicle, walked to meet Officer Patterson, and asked: "[h]ow do you want to do this?" (ECF No. 4-11, PageID.820–821.) Officer Patterson interpreted this question as Petitioner inquiring how to approach the vehicle. He noticed that Petitioner was "sweating bullets, like he had just got out of the shower," despite the fact that the weather was cool that evening. (ECF No. 4-11, PageID.820–821.)

Officer Patterson approached the vehicle on the passenger side, Petitioner on the driver's side. As they approached, Petitioner said, "there's a body", and began backpedaling from the vehicle. (ECF No. 4-11, PageID.822.) Officer Patterson moved to the driver's side of the vehicle and saw an electric cord hanging from the roof rack. He then realized a body with something tied to the neck was hanging from the vehicle into the ditch. Officer Patterson considered the scene to be a suicide and notified central dispatch. (ECF No. 4-11, PageID.822.)

Officer Patterson found Petitioner's behavior that evening unusual. During his tenure as an officer, Petitioner encountered many gruesome crime and accident scenes. But despite this experience, Petitioner appeared nervous and uneasy while at

3

the scene. That night, Officer Patterson noticed that Petitioner had a red spot in his eye. Several other events indicative of Petitioner's guilt unfolded that evening.

Webb's purse was removed from the vehicle. Inside her purse were a typewritten suicide note, a driver's license, and a cell phone. (ECF No. 4-11, PageID.823–824.) Petitioner retrieved the note and held in on the hood of the Aztec with his ungloved left index finger. Petitioner waited about 20 minutes to tell Officer Patterson that he knew the victim. (ECF No. 4-11, PageID.825.) Additionally, Detective Sergeant Waterman checked Webb's cell phone log and saw recent calls from a "Ken Cop Boo" whose number matched Petitioner's. (ECF No. 4-11, PageID.825–826.) When Officer Patterson returned to the police station to write his reports, he noticed Petitioner's eye— which had previously been red—was turning black and blue. (ECF No. 4-12, PageID.863.) He also noticed that Petitioner took his laundry bag to his truck, a departure from his usual practice of sending uniforms to the department's laundry service at the end of his shift. (ECF No. 4-12, PageID.861–862.)

At trial, witness testimony further corroborated the circumstantial evidence of Petitioner's guilt. Officer Patterson testified that Petitioner was certified as an instructor in pressure point control tactics (PPCT). (ECF No. 4-11, PageID.814.) He described PPCT as a means to control someone with your bare hands without harming them.

Dr. Kanu Virani, an expert in forensic pathology, testified that he performed the autopsy and that he found no injury or bleeding inside Webb's neck, which he would have expected to find if Webb's death had been caused by hanging. (ECF No. 4-20, PageID.1317–1318.) Based upon his autopsy findings and information provided by police investigators and other outside sources, Dr. Virani concluded that the cause of

Webb's death was neck compression and listed the manner of death as homicide. (ECF No. 4-20, PageID.1321–1322.) Dr. Virani testified that his autopsy findings were also consistent with ligature having caused the death. (ECF No. 4-20, PageID.1330.)

Buena Vista police officer Sara Sylvester testified that she worked the 12:00 p.m. to 12:00 a.m. shift on August 30, 2011. She testified that she shared a pizza with Petitioner around 7:30 p.m. that evening and that she did not notice any red mark around Petitioner's eye at that time. (ECF No. 4-12, PageID.880.)

Detective Sergeant Sean Waterman testified that he responded to a phone call from Officer Patterson regarding a possible suicide on the evening of August 30, 2011, near the intersection of North Outer Drive and Hack Road. (ECF No. 4-13, PageID.929.) When he arrived at the scene, Detective Waterman reviewed the victim's cell phone and saw two phone calls from Webb to Petitioner that evening (8:28 p.m. and 8:43 p.m.), and one call from Petitioner to Webb (8:48 p.m.). (ECF No. 4-13, PageID.931–932.)

On August 31, 2011, at 1:00 a.m., Detective Waterman notified Webb's family of her death. Her parents did not believe that she was suicidal. They explained that she was excited to be having a baby and showed Detective Waterman all of the preparations she had made for the baby. (ECF No. 4-13, PageID.936.) They identified Petitioner as the father of her baby. According to Detective Waterman, Webb told her parents she was going to meet Petitioner earlier that evening to discuss the Friend of the Court issue. Detective Waterman contacted Police Chief Brian Booker after speaking with Webb's parents, and Chief Booker told Detective Waterman to contact the Michigan State Police. (ECF No. 4-13, PageID.936–937.)

Several witnesses, including Webb's obstetrician, testified that Webb was excited about having a baby and did not appear depressed. Several witnesses also testified that Webb identified Petitioner as the father of her baby.

Colleen Auer-Lemke, an expert in forensic computer analysis, examined Petitioner's home computer and found that several searches had been performed during the summer of 2011 concerning suicide, painless ways to commit suicide, and hanging. (ECF No. 4-15, PageID.1084, 1094–1096.) She also found several searches from August 2011 regarding ways to die from carotid artery compression and how long such a death would take. (ECF No. 4-15, PageID.1100.)

Lisa Ramos testified as an expert in DNA analysis. (ECF No. 4-17, PageID.1212.) She conducted a paternity test and determined that Petitioner was the father of Webb's baby. She also tested blood collected from Webb's clothing and from inside and outside of Webb's vehicle and found that they matched Petitioner's DNA profile. ECF No. 4-17, PageID.1222.) Additionally, a swab from Webb's fingernails showed a mixture of Petitioner's and Webb's DNA profiles. (ECF No. 4-17, PageID.1221.)

Following a jury trial in Saginaw County Circuit Court, Petitioner was convicted of first-degree premeditated murder, assault of a pregnant individual with intent to cause miscarriage or stillbirth, and two counts of felony firearm possession. The court sentenced him to life in prison without parole for the first-degree murder conviction, 65 to 100 years for the assault conviction, and 2 years for each felony-firearm conviction.

Petitioner filed an appeal of right in the Michigan Court of Appeals raising seven claims for relief. The Michigan Court of Appeals affirmed his convictions, but remanded

to the trial court for "articulation of the justification for the sentencing departure for the assault conviction or resentencing." *People v. Bluew*, No. 313397, 2014 WL 3928790, *1 (Mich. Ct. App. Aug. 12, 2014). On remand, the trial court resentenced Petitioner on the assault conviction to 225 months to 40 years in prison. Petitioner sought and was denied leave to appeal in the Michigan Supreme Court. *People v. Bluew*, 497 Mich. 972 (Mich. 2015).

Petitioner then filed the pending habeas petition, raising these claims:

I. The Michigan Court of Appeals' determination that petitioner's attorney was not ineffective was an unreasonable application of Supreme Court law where the prosecution's expert testified that the victim died of a chokehold, and petitioner's attorney failed to call an expert to testify that her death could not have been caused by a chokehold.

II. The Michigan Court of Appeals' determination that petitioner's attorney was not ineffective was an unreasonable application of Supreme Court law where the attorney failed to present an expert in forensic pathology to testify that the autopsy findings established the victim's death was caused by hanging, and not by chokehold.

III. The Michigan Court of Appeals unreasonably applied Supreme Court law when it found no error in the trial court's denial of petitioner's challenges for cause and the subsequent seating of a biased juror.

IV. When Petitioner was left with a biased juror in his venire, the Michigan Court of Appeals unreasonably applied Supreme Court law when it found no abuse of discretion in the trial court's denial of petitioner's request for additional peremptory challenges.

V. The Michigan Court of Appeals' determination that the trial court did not abuse its discretion in denying the defense request for a change of venue was an unreasonable application of Supreme Court law.

(ECF No. 1, PageID.10–11.)

### III. STANDARD

Title 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405–406 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

The AEDPA "imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotations omitted). A "state court's determination that a claim lacks merit precludes federal habeas relief so long as

fairminded jurists could disagree on the correctness of the state court's decision."
*Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation omitted). The Supreme Court
has emphasized, "that even a strong case for relief does not mean the state court's
contrary conclusion was unreasonable." *Id.* at 102. Pursuant to § 2254(d), "a habeas
court must determine what arguments or theories supported or . . . could have
supported, the state court's decision; and then it must ask whether it is possible
fairminded jurists could disagree that those arguments or theories are inconsistent with
the holding in a prior decision" of the Supreme Court. *Harrington*, 562 U.S. at 101. A
"readiness to attribute error [to a state court] is inconsistent with the presumption that
state courts know and follow the law." *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002).

A state court's factual determinations are presumed correct on federal habeas
review. *See* 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption of
correctness only with clear and convincing evidence. *Id.* Moreover, for claims that were
adjudicated on the merits in state court, habeas review is "limited to the record that was
before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## IV.  DISCUSSION

### A. Ineffective Assistance of Trial Counsel Claims

Petitioner's first two claims concern the assistance of counsel. First, he argues
that defense counsel was ineffective because he failed to present an expert witness to
rebut the prosecution's theory that Ms. Webb died from the application of a lateral
vascular neck restraint rather than by hanging. Second, Petitioner claims that counsel
was ineffective in failing to present an expert in forensic pathology to challenge the

autopsy report. In support of these claims, Petitioner cites an affidavit of proposed expert John C. Leonard, and a letter of opinion of proposed expert Clark J. Schmidt.

A violation of the Sixth Amendment right to effective assistance of counsel is established where an attorney's performance was deficient and the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. To establish that an attorney's deficient performance prejudiced the defense, the petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Unless the petitioner demonstrates both deficient performance and prejudice, "it cannot be said that the conviction [or sentence] resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

The standard for obtaining habeas corpus relief is "'difficult to meet.'" *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Metrish v. Lancaster*, 569 U.S. 351, 358 (2013)). In the context of an ineffective assistance of counsel claim under *Strickland*, the standard is "all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (internal citations and quotation marks omitted). "[T]he question is not whether counsel's actions were reasonable"; but whether "there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

In this case, the Michigan Court of Appeals applied the *Strickland* standard and

held that defense counsel was not ineffective in choosing not to call an expert witness.

Prior to the start of jury selection, defense counsel informed the court that he had

consulted with two potential expert witnesses, Bruce Siddle and Elizabeth Laposita.

Counsel stated that "[a]fter conferring with those potential witnesses, the decision has

been made not to produce them, and therefore, no reports were produced." (ECF No. 4-

7, PageID.542.) The Michigan Court of Appeals held that defense counsel's decision

was not ineffective:

> We first note that defense counsel is not required to continue seeking
> experts until he finds one who will offer favorable testimony, *see People v.
> Eliason*, 300 Mich. App. 293, 300; 833 N.W.2d 357 (2013), and although
> defense counsel chose not to call them, he did consult with two experts,
> one in forensic pathology. Further, although the affidavits of Leonard and
> Schmidt may raise a question as to whether the victim died from hanging
> as opposed to a chokehold, they do not raise any reasonable question as
> to whether defendant killed the victim in light of the overwhelming
> evidence of guilt presented at trial. Specifically, there was extensive
> evidence of defendant's DNA and fingerprints on the victim's clothing and
> vehicle. Evidence such as defendant's DNA found underneath the victim's
> fingernails and in numerous bloodstains in the victim's vehicle, would not
> have been found if defendant was simply present at the scene to
> investigate the crime as part of his duties as a police officer. The evidence
> of phone calls between defendant and the victim shortly before she died,
> defendant's demeanor at the crime scene, and his injuries, further
> incriminate him. In the end, the means by which the victim died is
> immaterial where there is overwhelming evidence that defendant killed the
> victim by means of a violent assault. Accordingly, we conclude that
> defense counsel was not ineffective for failing to call an expert witness in
> PPCT and forensic pathology, particularly where they would not have
> deprived defendant of a substantial defense as to make a difference in the
> outcome of the trial.

*Bluew*, 2014 WL 3928790 at *1.

The rejection of this claim by the Michigan Court of Appeals is neither contrary to,

nor an unreasonable application of, Supreme Court precedent or federal law.

"*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington*, 562 U.S. at 111. Counsel did not simply ignore the possibility of presenting expert witnesses at trial. Counsel consulted two experts prior to trial but chose not to call them as witnesses. Petitioner fails to show that counsel's decision rendered counsel ineffective. Although some attorneys may have called an expert witness to testify, that is not the test for habeas review. The Supreme Court has held that there are "countless ways to provide effective assistance in any given case." *Strickland,* 466 U.S. at 689. Here, after consulting two experts, counsel chose to challenge Dr. Virani's testimony through cross-examination, which often "will be sufficient to expose defects in an expert's presentation." *Harrington*, 562 U.S. at 111. Counsel's cross-examination of the expert witness challenged Dr. Virani's observations and conclusions and constitutes capable advocacy. Ultimately, counsel elicited favorable testimony from Dr. Virani—that his autopsy findings were also consistent with the ligature having caused Webb's death. (ECF No. 4-20, PageID.1330.) For these reasons, the Michigan Court of Appeals' decision that defense counsel did not perform deficiently in failing to call an expert witness at trial was not contrary to or an unreasonable application of Supreme Court precedent.

Even assuming, *arguendo*, that counsel's performance was deficient, habeas relief is not warranted because the Michigan Court of Appeals reasonably determined that Petitioner was not prejudiced by any error. The *Strickland* standard for prejudice is a high bar. Petitioner must establish that "there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

The state court relied upon substantial evidence to conclude no prejudice resulted from counsel's decision not to call an expert witness: Petitioner's DNA and fingerprints were found on the victim's clothing and vehicle; Petitioner's DNA was found underneath the victim's fingernails and in numerous bloodstains in her vehicle; Petitioner and the victim exchanged several phone calls shortly before her death; Petitioner's demeanor at the crime scene was uncharacteristic and odd; and Petitioner's physical injuries indicated a struggle of some sort. *Bluew,* 2014 WL 3928790 at *1. Additionally, the following evidence not specifically cited by the Michigan Court of Appeals also supported Petitioner's convictions: testimony of numerous witnesses that Webb was not depressed and was happy about her pregnancy; Petitioner initially telling Police Chief Booker that he was not the father of the child; Petitioner failing to respond to numerous radio checks and other attempts to contact him around the time of Webb's death; and Petitioner's computer showing several suspicious searches in the time before Webb's death, including ways to die from carotid artery compression and strangulation.

In light of this substantial evidence, the state appellate court reasonably determined that defense counsel's failure to call expert witnesses was not prejudicial. Petitioner has not overcome the strong presumption that counsel rendered adequate assistance and "made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.

## B. Jury-Related Claims

### 1. Challenges for Cause

Petitioner argues that the trial court erred in denying his challenges for cause of four prospective jurors: Juror N (# 11), Juror S (# 42), Juror D (# 181), and Juror R (# 88). Three jurors (N, S, and D) expressed familiarity with the case based on media reports, and one (R) initially stated that a defendant had to prove his innocence. None of these allegations rise to the level of constitutional violation.

First, Juror N (# 11), when asked whether she had formed an opinion about the case, responded, "[W]hat they printed in the paper certainly looked damning." (ECF No. 4-7, PageID.569–570.) Juror N also said she did not remember many details about what she had read, that she would be able to set that information, and that she would have an "open mind" and be fair and impartial to both sides. (ECF No. 4-7, PageID.570.)

Second, Juror S (#42) read about Petitioner's case in the newspaper. She had an opinion that the prosecutor's office would undertake an investigation before pressing charges and that the office would not "mak[e] charges lightly." (ECF No. 4-8, PageID.657.) She also stated that she would not favor the prosecution and would consider the evidence with an open mind.

Third, Juror D (#181), who ultimately sat on Petitioner's jury, heard about the case through media reports and stated that the death of the unborn child made her "sick." (ECF No. 4-8, PageID.636.) However, she stated that she would be fair and impartial and view the evidence with an open mind.

Finally, Juror R (#88) initially believed that Petitioner bore the burden of proving his innocence. (ECF No. 4-10, PageID.751.) After the court explained the presumption

of innocence, Juror R agreed that he could accept as a rule of law that every defendant is presumed innocent. (ECF No. 4-10, PageID.755.)

The trial court denied defense counsel's challenges for cause as to each of these jurors. The defense used its peremptory strikes to remove Jurors N, S, and R (# 11, #42, and # 88). Juror D remained on the jury because the defense had no peremptory strikes remaining.

After citing controlling Supreme Court precedent, the Michigan Court of Appeals found no error in the trial court's denial of Petitioner's challenges for cause[1]:

> The trial court did not abuse its discretion in denying defendant's challenges for cause to excuse Jurors N, S, A, T, and D. Although the five prospective jurors had a preconceived notion of defendant's guilt, each of them unequivocally indicated in some fashion that they could set aside their opinion and render a verdict based on the evidence presented at trial. Specifically, Jurors S and T expressly assured the trial court that they could set aside their opinion and render a fair and impartial verdict based on the evidence. Although the other three jurors did not make this express assurance, each gave assurances that they would not decide the case based on their opinion. Juror N stated that she would absolutely try to keep an open mind about the evidence. She thought she could be fair and impartial to both sides. Indeed, because she could not remember many of the details, it would not be hard for her to set aside her opinion. Juror D thought she could keep an open mind about the evidence, and she believed that she could be fair and impartial. Juror A knew that she had not heard all the evidence, and she would keep an open mind about the evidence and follow the presumption that defendant was innocent. Because we defer to the trial court's superior ability to assess from the prospective jurors' demeanor whether they would be impartial, *Williams*, 241 Mich. App. at 522, we conclude that the trial court's denials of defendant's challenges for cause to these five prospective jurors did not fall outside the range of reasonable and principled outcomes.
>
> Second, defendant argues that the trial court erred in denying his challenge to Juror R because he disagreed with the presumption of

---

[1]  In addition to the four jurors discussed above, the Michigan Court of Appeals addressed the trial court's denial of challenges for cause as to Jurors A and T. Petitioner does not address the challenges against Jurors A and T in his habeas petition.

innocence. Although Juror R initially stated that he believed defendant needed to prove his innocence, when questioned further by the prosecutor and the trial court, he stated that he understood and accepted that defendant was presumed innocent. The statements by Juror R in response to the additional questioning were made without any qualification or apparent reluctance. This fact distinguishes the present case from *Franklin v. Anderson*, 434 F3d 412, 426–428 (6th Cir. 2006), a case relied on by defendant, where the Sixth Circuit held that the trial court erred when it failed to remove a prospective juror when the juror showed a continuing inability to understand the burden of proof even after being instructed on it by the trial court. Again, giving deference to the trial court's superior ability to assess Juror R's demeanor, we conclude that the trial court's decision not to excuse Juror R for cause fell within the range of reasonable and principled outcomes.

*Bluew*, 2014 WL 3928790 at *4.

On habeas corpus review, a federal court considering whether a trial court has seated a fair and impartial jury must determine "whether there is fair support in the record for the state courts' conclusion that the jurors . . . would be impartial." *Patton v. Yount*, 467 U.S. 1025, 1038 (1984). Factors to determine whether a fair and impartial jury has been assembled include: "the nature of the information the juror knew; how probative the information was as to a defendant's guilt; when and how they learned of that information; the juror's own estimation of the relevance of that knowledge; any express indications of partiality by a juror; whether the broader atmosphere in the community or courtroom was sufficiently inflammatory; and the steps taken by the trial court in neutralizing this information." *Gall v. Parker*, 231 F.3d 265, 308 (6th Cir. 2000) (internal citations omitted). A juror's familiarity with a case does not necessarily disqualify that juror. *See Thompson v. Parker*, 867 F.3d 641, 647 (6th Cir. 2017).

The determination of whether a juror is impartial has been recognized as a determination of credibility and, "therefore largely one of demeanor." *Patton*, 467 U.S. at 1038. The trial court's determination of such questions is entitled to "special deference."

*Id.* Where a prospective juror, subjected to extensive *voir dire*, has given ambiguous and at times contradictory answers, the trial judge is in the best position to render a judgment as to which of those ambiguous or contradictory statements are "the most fully articulated or . . . appear[] to have been least influenced by leading." *Id.* at 1039. "[O]nly the trial judge [can] tell which of [the apparently contradictory] answers was said with the greatest comprehension and certainty." *Id.* at 1040.

While Jurors N, S, and D, each expressed some familiarity with the case, each also affirmatively expressed an ability to set aside anything they learned outside the courtroom in reaching a verdict. Considering all of these factors, the court concludes that the record fairly supports the trial court's decision that these jurors need not have been excused for cause.

Initially, Juror R incorrectly assumed that Petitioner bore the burden of proving his innocence. Later, after the court explained the presumption of innocence, Juror R understood the legal standard of Petitioner's presumed innocence. Prospective jurors are not required to possess legal knowledge upon appearing for jury duty; they are required to follow the court's instructions. Juror R expressed an ability to do so, and the trial court clearly found his statements credible. "[A] trial court's finding that a juror was impartial is entitled to a presumption of correctness, rebuttable only upon a showing of clear and convincing evidence." *Dennis v. Mitchell*, 354 F.3d 511, 520 (2003). Petitioner fails to rebut the presumption of the trial court's correctness. Accordingly, the Michigan Court of Appeals' decision denying Petitioner's claim was not unreasonable.

## 2. Peremptory Challenges

In his fourth claim, Petitioner argues that the trial court violated his rights to a fair trial and impartial jury when it denied his request for additional peremptory challenges. Petitioner argues that because he was forced to use three peremptory challenges on Jurors N, S, and D, he had no remaining peremptory challenges to excuse Juror R.

The Supreme Court "has consistently held that there is no freestanding constitutional right to peremptory challenges." *Rivera v. Illinois*, 556 U.S. 148, 157 (2009). Rather, peremptory challenges are a "creature" of state law not required by the Constitution. *Ross v. Oklahoma*, 487 U.S. 81, 89 (1988). States are free to grant or withhold peremptory challenges, and "[w]hen states provide peremptory challenges . . . they confer a benefit beyond the minimum requirements of a fair jury selection." *Rivera*, 556 U.S. at 157–58 (internal quotation omitted).Therefore, a state court's denial of additional peremptory challenge "does not, without more, violate the Federal Constitution." *Id.* at 158.

As explained above, Petitioner has failed to show that Juror R was actually biased. Thus, Petitioner's "jury was impartial for Sixth Amendment purposes." *Id.* at 159. In other words, Petitioner "received precisely what due process required: a fair trial before an impartial and properly instructed jury, which found him guilty of every element of the charged offense[s]." *Id.* at 162. Accordingly, the Court denies habeas relief on this claim.

## C. Denial of Request for Venue Change

Petitioner's final claim concerns the trial court's denial of a defense motion for change of venue. Prior to trial, defense counsel moved for a change of venue. The trial

court took the motion under advisement pending an attempt to seat an impartial jury. Petitioner renewed the motion after exhausting all peremptory challenges. The trial court denied the motion finding that a fair and impartial jury had been seated.

Under controlling Supreme Court precedent, a change of venue should be granted if prejudicial pretrial publicity jeopardizes a defendant's right to a fair trial by an impartial jury. *See Irvin v. Dowd*, 366 U.S. 717, 722–24 (1961). Prejudice resulting from pretrial publicity can be presumed or actual. *Murphy v. Florida*, 421 U.S. 794, 799 (1975). Prejudice is presumed when adverse pretrial publicity is so pervasive, or the influence of the media creates such a "circus atmosphere" in the courtroom that "[t]he proceedings [are] entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob." *Id.* at 799. Courts presume prejudice in such cases because "adverse pretrial publicity can create such a presumption of prejudice in a community that jurors' claims that they can be impartial should not be believed." *Patton*, 467 U.S. at 1031. Cases of presumed prejudice from pretrial publicity are extremely rare. *See Campbell v. Bradshaw*, 674 F.3d 578, 593 (6th Cir. 2012); *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007).

Where the circumstances surrounding a case were not so egregious as to invoke a presumption of prejudice, a petitioner can show that the trial court erred in denying a request for change of venue by demonstrating actual prejudice. *Murphy*, 421 U.S. at 800–01. The "primary tool" for determining whether actual prejudice arose is a "searching voir dire of the prospective jurors." *Ritchie v. Rogers*, 313 F.3d 948, 962 (6th Cir. 2002).

Here, the Michigan Court of Appeals denied Petitioner's claim, stating:

Two approaches may be used to determine whether justice demands a change of venue. [*People v. Jendrzejewski*, 455 Mich. 495, 500-501 (1997)]. First, "[c]ommunity prejudice amounting to actual bias has been found where there was extensive highly inflammatory pretrial publicity that saturated the community to such an extent that the entire jury pool was tainted." *Id.* at 500-501. Second, "community bias has been implied from a high percentage of the venire who admit to a disqualifying prejudice." *Id.* at 501.

For the first approach, defendant did not present to the trial court any documentary evidence to support his assertion of extensive media coverage. Consequently, we do not know the extent to which the case was reported in the media or the content of the media reports to determine whether the publicity was extensive and highly inflammatory as to incite community prejudice. Although most prospective jurors indicated having some knowledge of the case, where the record contains no evidence regarding how often the case was reported in the media and whether the reports were factual or inflammatory, we cannot conclude that the pretrial publicity was so unrelenting and prejudicial that it amounted to actual prejudice against defendant such that the trial court abused its discretion in denying the motion for change of venue. *See id.* at 500–501.

For the second approach, based on our review of the record, 93 prospective jurors were asked whether they had any knowledge about the case. Only 13 replied that they knew nothing about it. Seventy-eight of the prospective jurors, which included two of the jurors who had indicated they had no knowledge of the case, were individually questioned regarding whether they had an opinion on defendant's guilt. The trial court excused 23 of them because they admitted that they could not set aside their opinions. In addition, one of the prospective jurors who initially had no knowledge about the case was excused after his father told him about it and he formed an opinion on defendant's guilt that he could not set aside. Thus, out of the 11 prospective jurors who had not heard about defendant's case and were not individually questioned and the 78 jurors who were questioned about their knowledge of the case, 24 of them were excused for cause after they admitted to a disqualifying bias.[4] The percentage of jurors excused was less than the percentage that this Court in *People v. DeLisle*, 202 Mich. App 658, 667–669; 509 NW2d 885 (1993), held was insufficient to presume that the seated jurors were biased, and was only minimally higher than the percentage that the United States Supreme Court stated "by no means suggests a community with sentiment so poisoned against [the defendant]." *Murphy v. Florida*, 421 U.S. 794, 803; 95 S Ct 2031; 44 L.Ed.2d 589 (1975). Under these circumstances, we cannot conclude that the trial court abused its

discretion in denying defendant's motion for change of venue on the basis that the pretrial publicity led to a deeply hostile community against defendant so "as to impeach the indifference of jurors who displayed no animus of their own." *Id.*

[4]Four jurors who indicated that they had knowledge of the case were excused for other reasons before they could be individually questioned.

*Bluew*, 2014 WL 3928790, at *5–*6.

Based on these facts, the court concludes that the Michigan Court of Appeals' decision that the pretrial publicity did not result in presumptive prejudice is not contrary to or an unreasonable application of Supreme Court precedent. It is clear and not surprising that this case received media coverage, but Petitioner has presented no evidence that the trial was conducted in an "inflammatory, circus-like atmosphere," or that the conviction was "obtained in a trial atmosphere that had been utterly corrupted by press coverage." *Murphy*, 421 U.S. at 798.

Neither has Petitioner shown actual prejudice. "Mere prior knowledge of the existence of the case, or familiarity with the issues involved, or even preexisting opinion as to the merits, does not in and of itself raise a presumption of jury taint." *People v. DeLisle*, 509 N.W.2d 885, 382 (Mich. 1993). "Rather, 'the relevant question is did the juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed.'" *Campbell v. Bradshaw*, 674 F.3d 578, 594 (6th Cir. 2012) (citing *Foley*, 488 F.3d at 387). Petitioner does not show that *voir dire* failed to detect juror bias. All of the seated jurors indicated that they would base their decision on the evidence presented at trial and would follow the court's instructions. Because Petitioner has failed to provide clear and convincing evidence that the jurors empaneled could not be impartial, he is not

entitled to habeas relief on his change of venue claim. *See Bell v. Hurley*, 97 Fed. App'x 11, 19 (6th Cir. 2004).

## V.  CERTIFICATE OF APPEALABILITY

Before Petitioner may appeal the court's decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation omitted). In this case, reasonable jurists would not debate the court's conclusion that the petition fails to state a claim upon which habeas corpus relief should be granted. Therefore, the court denies a certificate of appealability.

## VI.  CONCLUSION

IT IS ORDERED that the petition for a writ of habeas corpus (ECF No. 1) is DENIED and that a certificate of appealability is DENIED. A separate judgment will issue.

s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  September 16, 2019

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, September 16, 2019, by electronic and/or ordinary mail.

s/Lisa Wagner
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\HEK\Staff Attorney\16-11992.BLUEW.deny habeas.mbc.HEK.2.docx